UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

DANIEL HERMAN,

                                Plaintiff,                        9:23-cv-1002 (BKS/TWD)

v.

IMTIAZ SAMAD,

                                Defendant.
_____

**Appearances:**

*For Plaintiff*:
Amy Jane Agnew
Joshua L. Morrison
Law Office of Amy Jane Agnew, P.C.
24 Fifth Avenue, Suite 1701
New York, New York 10011

*For Defendant*:
Oriana L. Kiley
Anthony R. Bjelke
Whiteman Osterman & Hanna LLP
One Commerce Plaza
Albany, New York 12260

**Hon. Brenda K. Sannes, Chief United States District Judge:**

## MEMORANDUM-DECISION AND ORDER

**I.    INTRODUCTION**

       On August 17, 2023, Plaintiff Daniel Herman initiated this action pursuant to 42 U.S.C. § 1983 against Defendants Imtiaz Samad and David Dinello, alleging a claim for deliberate indifference under the Eighth Amendment. (Dkt. No. 1.) Plaintiff subsequently moved before the United States Judicial Panel on Multidistrict Litigation ("MDL Panel") for transfer of the action, along with numerous other actions filed by Plaintiff's counsel, under 28 U.S.C. § 1407 for

coordinated or consolidated pretrial proceedings. (Dkt. No. 5.) On December 7, 2023, the MDL Panel denied Plaintiff's § 1407 motion. *In re N.Y. Dep't of Corr. & Cmty. Supervision Medications With Abuse Potential Prisoner Litig.*, No. MDL 3086, --- F. Supp. 3d ----, 2023 WL 8539909, at *3, 2023 U.S. Dist. LEXIS 219565, at *5 (J.P.M.L. Dec. 7, 2023).[1]

Presently before the Court is Defendant Samad's motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. (Dkt. No. 27.) The motion is fully briefed. (Dkt. Nos. 28–29.) For the following reasons, Defendant's motion to dismiss is granted, and Plaintiff is granted to leave amend.

## II.     FACTS[2]

### A.     Medications With Abuse Potential Policy

Plaintiff, who was held in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS") from 2019 to 2021, alleges that Defendant's continued refusal to represcribe Neurontin to treat Plaintiff's chronic pain due to DOCCS policies and customs constitutes deliberate indifference. (Dkt. No. 1, ¶¶ 332–38.)

DOCCS' "policy on Medications With Abuse Potential" ("MWAP") was promulgated on June 2, 2017. (*Id.* ¶¶ 144–45.)[3] On its MWAP list, "DOCCS included a group of . . . ubiquitous medications, including" the medication at issue here: Neurontin (also known as Gabapentin), "an anticonvulsant generally taken to control seizures" and "often prescribed to relieve nerve pain."

---

[1] On July 29, 2024, the parties stipulated to dismissal of Defendant Dinello, (Dkt. Nos. 33–34), leaving only Defendant Samad.

[2] These facts are drawn from the complaint. (Dkt. No. 1.) The Court assumes the truth of, and draws reasonable inferences from, the well-pleaded factual allegations, *see Lynch v. City of New York*, 952 F.3d 67, 74–75 (2d Cir. 2020), but does not accept as true any legal conclusions, *see Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

[3] The MWAP policy is codified as DOCCS Health Services Policy 1.24, "Medications with Abuse Potential."

2

(*Id.* ¶¶ 77, 87.)[4] The medications on the MWAP list "are not risk free," and "[l]ike any medication they can be abused, but many of them—including Neurontin . . . —are considered to have low addiction potential." (*Id.* ¶ 97–98.) "DOCCS, its physicians and mid-level clinicians have been aware of the risks of these medications for decades." (*Id.* ¶ 99.)

Under the MWAP policy, a provider must "submit an MWAP Request Form" to the Regional Medical Director ("RMD") in charge of their hub. (*Id.* ¶¶ 157–58.) The MWAP Request Form "asked for relevant health information regarding the patient, the justification for use of the medication and a list of any alternatives tried to treat the medical issue." (*Id.* ¶ 159.) The MWAP Request Form "also asked if there is any recent evidence of drug diversion or abuse by the patient." (*Id.* ¶ 160.) "Based on the MWAP Request Form contents—the RMD and not the patient's medical provider—determined whether a patient will receive an MWAP." (*Id.* ¶ 163.) The treating physicians and mid-level clinicians "had to discontinue an MWAP prescription if it was not approved by the RMD"; "pharmacies would not fill a prescription for an MWAP without RMD approval"; and providers "had no ability to provide the medication once an RMD refused to approve the prescription." (*Id.* ¶ 167.)

The MWAP policy "had the immediate impact of abruptly discontinuing the effective treatment of hundreds of inmates on MWAPs." (*Id.* ¶ 173.) "As implemented, the MWAP Policy was an almost wholesale restriction on the prescription of MWAPs, except in cases of acute need or palliative care." (*Id.* ¶ 106.) This stands in contravention of the positions of several other agencies, such as the National Commission on Correctional Health Care, of which DOCCS is an accredited member, who published a position indicating that "[c]linicians should not approach

---

[4] Although Plaintiff appears to allege that Neurontin was in a 2019 Formulary Book and was therefore available to doctors to prescribe without approval from an administrator, (*id.* ¶¶ 35–36, 38), Plaintiff's allegations as to the Medications With Abuse Potential policy and related customs suggest that the MWAP policy altered these practices.

the treatment of chronic pain as a decision regarding the use or nonuse of opioids (as in acute pain)[;] [r]ather clinicians should consider all aspects of the problem and all available proven modalities," and "[p]olicies banning opioids should be eschewed." (*Id.* ¶¶ 107–09.) Similarly, the Federal Bureau of Prisons' ("BOP") Clinical Guideline does not prohibit use of opioids or neuromodulating medications like Neurontin but instead "lists Neurontin . . . as [a] second line treatment[] for neuropathic pain." (*Id.* ¶¶ 111–12.) The American Correctional Association, by which DOCCS is accredited, "lists the BOP Clinical Guideline . . . as its clinical guideline standard." (*Id.* ¶ 113.) The New York State Department of Health "has only two main concerns regarding Neurontin/Gabapentin: it recommended avoiding prescriptions in doses higher than 3600 mg per day because there is no evidence of increase in therapeutic dose, and it recommended avoidance of use of Neurontin by a patient benefiting from concurrent opioid treatment." (*Id.* ¶ 114.) The American Medical Association "also does not restrict the prescription of many of the medications on the MWAP list." (*Id.* ¶ 115.) In fact, "[t]he standard in the medical community is to use medications like Neurontin . . . and other non-opioid MWAPS to treat chronic conditions to reduce the number of opioid prescriptions"; "[t]he standard in the medical community is not to restrict all effective treatment." (*Id.* ¶ 117.)

In February 2021, "as a direct result of class action litigation, DOCCS . . . rescinded the MWAP Policy and promulgated a new policy[,] 1.24A," entitled "Prescribing for Chronic Pain." (*Id.* ¶ 285.)[5] "The new policy demanded 'Pain management medication should only be discontinued after a provider has met with the patient, discussed the issues regarding the use of

---

[5] Plaintiff appears to be referring to class-action litigation in the Southern District of New York challenging the MWAP policy. *See Allen v. Koenigsmann*, No. 19-cv-8173 (S.D.N.Y.).

4

the medication, analyzed the patient's situation, and subsequently determined that it is in the best interest of the patient for the medication to be discontinued.[']" (Dkt. No. 1, ¶ 286.)

B.     **Plaintiff's Medical Issues**

Plaintiff, who is 63 years old, suffered a traumatic gunshot wound to his right leg in 1992 while serving in the military. (*Id.* ¶¶ 5, 291.) "This injury was exacerbated [in] 2006 by a motorcycle accident that fractured his right tibia[,] leaving permanent hardware in his leg." (*Id.* ¶ 292.) "As a result of these injuries, [Plaintiff] suffers from foot drop, muscle atrophy, and neuropathy," which cause Plaintiff "chronic pain and require continuous pain management." (*Id.* ¶¶ 293–94.) Plaintiff's "pain was effectively treated by Neurontin, before and after he was in DOCCS' custody." (*Id.* ¶ 295.)

On December 4, 2017, Plaintiff "was in the custody of New York City Department of Corrections." (*Id.* ¶ 296.) "An X-ray on his right femur confirmed metallic hardware in his leg from previous injuries." (*Id.* ¶ 297.) In 2018, "while in New York City custody," Plaintiff "was assessed with foot drop and muscle atrophy." (*Id.* ¶ 298.) Plaintiff "was prescribed Robaxin for spasms and Naproxen for pain." (*Id.* ¶ 299.) On April 10, 2018, Plaintiff's "medical provider in New York City jail also started him on Neurontin 400mg to treat his neuropathic pain." (*Id.* ¶ 300.) Plaintiff "remained on Neurontin while in the custody of New York City DOC to treat his neuropathic pain." (*Id.* ¶ 301.)

On April 18, 2019, Plaintiff "was transferred from New York City custody to the custody of DOCCS at Ulster Correctional Facility." (*Id.* ¶ 302.) "When a patient is first 'drafted in' to DOCCS he/she generally resides at a reception facility until staff conducts a medical assessment and a department called 'Movement and Classification' determines the best housing for the patient." (*Id.* ¶ 69.) The medical staff at a reception facility maintain a patient on all the medications and prescriptions they were taking before being "drafted in" to ensure continuity of

care. (*Id.* ¶ 70.) "The medical staff at the reception facility conduct a thorough individualized assessment of the patient's health issues for use by practitioners in receiving facilities, and their findings related to major disease or mobility issues are entered into the patient's Medical Problem List." (*Id.* ¶ 71.) Upon transfer to a facility for housing, "a nurse is supposed to conduct an 'assessment[]' of the patient," and if a "prisoner needs medications prescribed, a medical provider is given the medication list to review for ordering." (*Id.* ¶ 72.)

Plaintiff's "intake papers note his Neurontin prescription and that he was to be evaluated at a physical." (*Id.* ¶ 303.) Plaintiff "was seen on April 19, 2019 and the provider noted a past GSW injury and motorcycle accident injury." (*Id.* ¶ 304.)[6] Plaintiff "was provided with a cane and the provider noted that 'prior authorization for Gabapentin will be done.'" (*Id.* ¶ 305.)

On April 22, 2019, Plaintiff "went to sick call because he had not been provided his Neurontin medication." (*Id.* ¶ 306.) Plaintiff's medical chart "noted that the facility was awaiting approval for his prescription." (*Id.*) On April 23, 2019, "a notation in [Plaintiff's] medical record done by [a] medical provider . . . indicates that Neurontin approval was not completed due to lack of diagnostic testing documentation." (*Id.* ¶ 307.) The medical provider prescribed Plaintiff Meloxicam. (*Id.* ¶ 308.)

On April 26, 2019, Plaintiff "went to sick call with his medical records explaining he was in severe neuropathic pain." (*Id.* ¶ 309.) A medical provider "discontinued Meloxicam and prescribed Neurontin 800mg BID and requested to obtain the neurology consult he had at Rikers Island." (*Id.* ¶ 310.)

On May 14, 2019, Plaintiff was transferred to Mohawk Correctional Facility. (*Id.* ¶ 311). When Plaintiff arrived at Mohawk, he had a prescription for Neurontin 800mg. (*Id.* ¶ 313.)

---

[6] "GSW" is not defined in the complaint.

6

"Immediately at arrival the prescription was discontinued" and "[n]o provider saw or examined" Plaintiff. (*Id.* ¶ 314.) Plaintiff "was scheduled to see a provider for the first time five days later." (*Id.* ¶ 315.)

On May 20, 2019, Plaintiff "saw [Defendant] who informed him that he could not have Neurontin." (*Id.* ¶ 316.) Defendant "offered Elavil, but [Plaintiff] refused because he did not want to take a psychotropic drug and felt uncomfortable taking it." (*Id.*) Plaintiff left with only being provided Motrin for his neuropathic pain." (*Id.* ¶ 317.)

On May 23, 2019, Plaintiff "reported to sick call due to increased pain." (*Id.* ¶ 318.) Plaintiff "informed the nurse that Motrin did not help the pain and he inquired whether there are any non-psychotropic medications he could take since Neurontin was not allowed in the facility." (*Id.*) Nothing was provided. (*Id.*)

Plaintiff "was seen by [Defendant] on May 28, 2019," and Defendant "again informed [Plaintiff] that he could not prescribe him Neurontin for neuropathy." (*Id.* ¶ 319.) At that appointment, Defendant "provided Naproxen, but it was ineffective." (*Id.* ¶ 320.)

On June 11, 2019, Defendant "again saw [Plaintiff] to discuss his medical condition" and Plaintiff "again explained that Neurontin was effective medication for him, yet [Defendant] only offered him psychotropic medication again which he declined." (*Id.* ¶ 321.)

On October 9, 2019, the Center for Appellate Litigation sent a letter to Defendant about his refusal to treat Plaintiff with Neurontin to address his continued chronic neuropathy. (*Id.* ¶ 322.) On December 6, 2019, Plaintiff "wrote sick call to be treated with pain medication for his severe neuropathy in his leg." (*Id.* ¶ 323.) On December 12, 2019, Plaintiff "was suffering more pain and was provided only Ibuprofen until his Naproxen script came in." (*Id.* ¶ 324.)

7

On December 27, 2019, the Legal Aid Society wrote to the Mohawk Facility Health Service Director "regarding [Defendant's] refusal to prescribe [Plaintiff] Neurontin despite the ineffectiveness of alternatives." (*Id.* ¶ 325.) The Legal Aid Society "asked that DOCCS reevaluate [Plaintiff] and the policies of not providing Neurontin to patients like him." (*Id.*)

On May 2, 2020, Plaintiff "again complained of right lower extremity pain and requested to be referred to an orthopedic specialist and neuro specialist." (*Id.* ¶ 326.) His request to see a specialist was denied. (*Id.*) Plaintiff "continued to suffer without effective treatment." (*Id.*)

In August 2021, Plaintiff "was released" and "immediately went to see his physician," who "prescribed Neurontin 800mg for pain management" (*Id.* ¶¶ 327–28.)[7] Plaintiff "was also deemed permanently disabled by Suffolk County Social Serviced Department." (*Id.* ¶ 330.)

Plaintiff alleges that he "was a victim of [a] grand plan" that involved certain DOCCS medical administrators determining "to remove certain medications from DOCCS[] facilities— not based on patients' needs or efficacy—but the perceived 'abuse potential' of the medication." (*Id.* ¶¶ 333, 336.) "If patients like [Plaintiff] had the misfortunate to be housed in facilities within [former Defendant] Dinello's [region], their medications were discontinued by providers— sometimes just at transfer, or for unconfirmed reports by security of diversion attempts, or because facilities did not 'give that here.[']" (*Id.* ¶ 334.) Plaintiff alleges that "DOCCS' Central Office started marking each facility's ability to get their patients off the medications" and that "[d]iscontinuations were done without medical justification or individualized assessments." (*Id.* ¶ 335.) "Despite having his medical records for review, [Defendant] continuously refused to represcribe [Plaintiff's] effective treatment due to these policies and customs." (*Id.* ¶ 337.) Plaintiff "repeatedly and consistently reported his pain and suffering to no avail," and Plaintiff

---

[7] Plaintiff elsewhere alleges that he exited DOCCS' custody "late August of 2020." (*Id.* ¶ 5.)

8

"suffered severely for over two years due to Defendant's adherence to the[se] customs, policies and practices." (*Id.* ¶¶ 338.)

### III.   LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, "a complaint must provide 'enough facts to state a claim to relief that is plausible on its face.'" *Mayor & City Council of Balt. v. Citigroup, Inc.*, 709 F.3d 129, 135 (2d Cir. 2013) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Although a complaint need not contain detailed factual allegations, it may not rest on mere labels, conclusions, or a formulaic recitation of the elements of the cause of action, and the factual allegations 'must be enough to raise a right to relief above the speculative level.'" *Lawtone-Bowles v. City of New York*, No. 16-cv-4240, 2017 WL 4250513, at *2, 2017 U.S. Dist. LEXIS 155140, at *5 (S.D.N.Y. Sept. 22, 2017) (quoting *Twombly*, 550 U.S. at 555). A court must accept as true all well-pleaded factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor. *See EEOC v. Port Auth.*, 768 F.3d 247, 253 (2d Cir. 2014) (citing *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007)). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678.

### IV.   DISCUSSION

#### A.   Statute of Limitations

Defendant argues that Plaintiff's claim is time-barred and must therefore be dismissed. (Dkt. No. 27-1, at 10–12.) Plaintiff argues that he is entitled to tolling under the continuing violation doctrine. (Dkt. No. 28, at 19–20.) In reply, Defendant argues that Plaintiff has not alleged acts of Defendant within the relevant period that would render the continuing violation policy applicable. (Dkt. No. 29, at 5–6.)

"The statute of limitations for § 1983 actions arising in New York is three years." *Lucente v. County of Suffolk*, 980 F.3d 284, 308 (2d Cir. 2020); *see also Shomo v. City of New York*, 579 F.3d 176, 181 (2d Cir. 2009) ("The statute of limitations for claims brought under Section 1983 is governed by state law, and [for an Eighth Amendment deliberate indifference claim] is the three-year period for personal injury actions under New York State law."). "A Section 1983 claim ordinarily 'accrues when the plaintiff knows or has reason to know of the harm.'" *Shomo*, 579 F.3d at 181 (quoting *Eagleston v. Guido*, 41 F.3d 865, 871 (2d Cir. 1994)).

However, the "continuing violation doctrine is an 'exception to the normal knew-or-should-have-known accrual date,'" *id.* (quoting *Harris v. City of New York*, 186 F.3d 243, 248 (2d Cir. 1999)), which the Second Circuit has applied to Eighth Amendment deliberate indifference claims, *see Williams v. Annucci*, No. 20-cv-1417, 2021 WL 4775970, at *3, 2021 U.S. Dist. LEXIS 196917, at *8 (N.D.N.Y. Oct. 13, 2021) (collecting cases). The continuing violation doctrine "applies to claims 'composed of a series of separate acts that collectively constitute one unlawful [] practice.'" *Gonzalez v. Hasty*, 802 F.3d 212, 220 (2d Cir. 2015) (alteration in original) (quoting *Washington v. County of Rockland*, 373 F.3d 310, 318 (2d Cir. 2004)). "To assert a continuing violation for statute of limitations purposes" in the context of an Eighth Amendment claim for deliberate indifference, "the plaintiff must 'allege both the existence of an ongoing policy of [deliberate indifference to his or her serious medical needs] and some non-time-barred acts taken in the furtherance of that policy.'" *Id.* at 182 (alteration in original) (quoting *Harris*, 186 F.3d at 250). This is because "[w]hen the plaintiff brings a Section 1983 claim challenging a . . . policy [of deliberate indifference], 'the commencement of the statute of limitations period may be delayed until the last discriminatory act in furtherance of it.'" *See id.* at 181–82 (quoting *Cornwell v. Robinson*, 23 F.3d 694, 703 (2d Cir. 1994)). The

10

continuing violation doctrine does not, however, apply to "discrete unlawful acts, even if those discrete unlawful acts are part of 'serial violations.'" *See Lucente*, 980 F.3d at 309 (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114–15 (2002)).

"Although the statute of limitations is ordinarily an affirmative defense that must be raised in the answer, a statute of limitations defense may be decided on a Rule 12(b)(6) motion if the defense appears on the face of the complaint." *See Conn. Gen. Life Ins. Co. v. BioHealth Labs., Inc.*, 988 F.3d 127, 131–32 (2d Cir. 2021) (quoting *Thea v. Kleinhandler*, 807 F.3d 492, 501 (2d Cir. 2015)). In the context of an alleged continuing violation, if a plaintiff alleges "some [] act that did occur within the statute of limitations, so that his claim would not be time-barred," *Harris*, 186 F.3d at 250, and "[t]he complaint suggests a pattern" of deliberately indifferent treatment, *see Shomo*, 579 F.3d at 182, an Eighth Amendment claim for deliberate indifference can withstand a challenge for failure to state a claim.

Here, the latest allegation involving an affirmative act by Defendant is his offer to Plaintiff of psychotropic medication rather than Neurontin on June 11, 2019. (Dkt. No. 1, ¶ 321.) The latest alleged act explicitly involving Defendant at all occurred December 27, 2019, when the Legal Aid Society wrote to the Mohawk Facility Health Service Director "regarding [Defendant's] refusal to prescribe [Plaintiff] Neurontin despite the ineffectiveness of alternatives." (*Id.* ¶ 325.) The latest alleged act involving *any* DOCCS-provided medical treatment—though it did not explicitly involve Defendant—occurred on May 2, 2020, when Plaintiff "complained of right lower extremity pain and requested to be referred to an orthopedic specialist and a neuro specialist," but "[h]is request to see a specialist was denied," and Plaintiff "continued to suffer without effective treatment." (*Id.* ¶ 326.)[8] All of these alleged acts occurred

---

[8] The Court notes that, for the continuing violation doctrine to apply, Plaintiff must allege non-time-barred acts *by Defendant* that give rise to an Eighth Amendment deliberate indifference claim. *See Lucente*, 980 F.3d at 310 (holding

11

before August 17, 2020, the earliest day of the three-year period ending on the date on which Plaintiff filed his complaint. They therefore fall outside the statute-of-limitations period. Thus, Plaintiff's complaint is untimely, and, accordingly, Defendant's motion to dismiss is granted.[9]

### B. Leave to Amend

In response to Defendant's motion to dismiss, Plaintiff requests leave to amend. (Dkt. No. 28, at 20.) Defendant has not opposed Plaintiff's request.

Under Federal Rule of Civil Procedure 15(a), absent certain circumstances not at play here, a party may amend its pleading only with the opposing party's written consent or the court's leave. *See* Fed. R. Civ. P. 15(a)(1)–(2). Rule 15(a)(2) requires that a court "freely give leave when justice so requires." *See McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007). But a court may, in its discretion, deny leave to amend "for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party." *MSP Recovery Claims, Series LLC v. Hereford Ins. Co.*, 66 F.4th 77, 90 (2d Cir. 2023).

Here, because Plaintiff has requested leave to amend and has not yet had an opportunity to amend, and because it is not apparent that amendment would be futile or that there is otherwise good reason to deny leave to amend, the Court grants Plaintiff's request for leave to amend the complaint.

### V. CONCLUSION

For these reasons, it is hereby

---

that § 1983 claims could proceed against certain individual defendants "as long as each plaintiff alleged an unconstitutional act committed by each particular defendant that falls within the three-year statutory period"); *Shomo*, 579 F.3d at 183 ("The continuing violation doctrine does not apply to the claim against [the individual defendant] because there is no indication that [the plaintiff] is able to allege acts involving [that defendant] that fall within the three-year statutory period.").

[9] Because the Court grants Defendant's motion on statute-of-limitations grounds, the Court does not address Defendant's arguments as to the merits of Plaintiff's claim.

**ORDERED** that Defendant's motion to dismiss under Rule 12(b)(6), (Dkt. No. 27), is **GRANTED**; and it is further

**ORDERED** that the complaint, (Dkt. No. 1), is **DISMISSED without prejudice**; and it is further

**ORDERED** that Plaintiff's request for leave to amend is **GRANTED**, and it is further

**ORDERED** that Plaintiff must file any amended complaint within thirty days of the date of this Order.

**IT IS SO ORDERED.**

Dated: July 31, 2024
Syracuse, New York

Brenda K. Sannes
Chief U.S. District Judge