UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---

HERMAN DANIEL,

|  |  |  |
|---|---|---|
| | Plaintiff, | 9:23-cv-1002 (ECC/CBF) |
| v. | | |
| IMTIAZ SAMAD, | | |
| | Defendant. | |

---

Amy J. Agnew, Esq., *for Plaintiff*
Oriana L. Kiley, Esq., *for Defendants*

**Hon. Elizabeth C. Coombe, United States District Judge:**

**MEMORANDUM-DECISION AND ORDER**

## I.    INTRODUCTION

Plaintiff commenced this action by filing a Complaint pursuant to 42 U.S.C. § 1983, alleging deliberate indifference to his medical needs in violation of the Eighth Amendment.  Dkt. No. 58.  Presently before the Court is the Defendant's motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.  Dkt. Nos. 74, 75, 76, 77, 78, 79.  In the same motion, Defendant seeks an order precluding and/or striking the expert testimony and reports of Plaintiff's expert.  *Id.*  The motion is fully briefed.  Dkt. Nos. 88, 89, 90, 91, 95.  For the reasons that follow, Defendant's motion for summary judgment is granted, and Plaintiff's Second Amended Complaint is dismissed with prejudice.

## II.    BACKGROUND

### A.    The MWAP Policy and Class Action Litigation

The Court assumes familiarity with its decision in the related case *Daniels v. Mandalaywala*, No. 9:23-cv-1001 (ECC/CBF), 2026 WL 575511, at *1 (N.D.N.Y. Mar. 2, 2026).

The following is a streamlined version of the litigation history surrounding the Medications with Abuse Potential Policy.

In 2017, DOCCS adopted the Medications with Abuse Potential (MWAP) Policy. The MWAP Policy regulated the prescription of certain medications that were deemed to carry a risk of abuse or dependence. Under the MWAP Policy, primary care providers in DOCCS facilities seeking to prescribe a designated medication had to complete and submit a request form to a Regional Medical Director (RMD) for approval. As relevant to this action, medication that required RMD approval under the MWAP Policy included Neurontin, also known by its generic name Gabapentin. In February 2021, DOCCS rescinded the MWAP Policy and adopted Health Services Policy 1.24(A). Policy 1.24(A) reformed DOCCS's process for prescribing pain management medication and eliminated the RMD's prior role entirely.

The MWAP Policy has since been subject to class-action litigation brought by several named DOCCS inmates on behalf of a class of individuals in DOCCS custody whose medications were allegedly denied or discontinued pursuant to the policy. *See Allen v. Koenigsmann,* No. 19-cv-8173, 2023 WL 2731733 (S.D.N.Y. Mar. 31, 2023). Plaintiffs in the class action asserted deliberate indifference to medical needs claims pursuant to 42 U.S.C. § 1983. Ultimately, the *Allen* plaintiffs were granted a permanent injunction enjoining implementation of the MWAP Policy and awarded attorneys' fees. *Allen v. Koenigsmann,* 700 F. Supp. 3d 110, 145 (S.D.N.Y. 2023). However, the *Allen* Court denied the plaintiffs' motion to certify a class to pursue damages for liability. *Allen*, 2023 WL 2731733, at *6. Various plaintiffs have since filed individual suits for damages against DOCCS employees alleging violations of § 1983 based on deliberate indifference to their serious medical needs.

2

### B.    Plaintiff's Medical and Treatment History[1]

Plaintiff suffered a gunshot wound to his right leg in 1992, resulting in injuries that were further exacerbated in a 2006 motorcycle accident.  Dkt. No. 90 ¶¶ 2-3.  As a result of these injuries, Plaintiff experienced muscle atrophy, right foot drop, and neuropathic pain.  *Id.*

In April 2018, Plaintiff was prescribed Neurontin while in the custody of the New York City Department of Corrections at Riker's Island.  Dkt. No. 90 ¶ 7.  The parties contest whether the Neurontin effectively treated Plaintiff's neuropathic pain.  Medical records indicate that on May 7, 2018, Plaintiff reported to medical staff that he "ha[d] been on gabapentin for 3 weeks without improvement to his [surgery]," and that Plaintiff indicated "he does not take [the] gabapentin anyway . . . He states he does not want to continue with the gabapentin either although when I asked the patient if I could [discontinue] it, he refused."  Dkt. No. 79-3 at 4.  According to Plaintiff, until he was "educated" he was not taking his medication properly, which caused the medication to initially be ineffective.  Dkt. No. 90 ¶ 9.

Plaintiff continued with a prescription for Neurontin until his arrival in DOCCS custody on April 17, 2019.  Dkt. No. 90 ¶ 10.  A new prescription was issued at Ulster Correctional Facility on April 26, with a note indicating "need neurology eval at perm[anent] Facility."  *Id.* at ¶ 13.

Plaintiff arrived at Mohawk Correctional Facility on May 14, 2019 and underwent a "transfer screening."  Dkt. No. 90 ¶¶ 16, 17.  Medical records indicate that Plaintiff presented with a chronic pain condition with prior surgery and placement of a metal rod to his right femur in 2006.  Dkt. No. 79-3 at 235.  Plaintiff maintained a prescription for Meloxicam and Neurontin for these

---

[1] The facts are drawn from the parties' submissions, including Defendant's Statement of Material Facts, Dkt. No. 74-1, and Plaintiff's response to that statement, Dkt. No. 90, to the extent those facts are well-supported by pinpoint citations to the record and the exhibits the parties have submitted. Disputed facts are noted. The facts are construed in the light most favorable to the non-moving party. *Gilles v. Repicky*, 511 F.3d 239, 243 (2d Cir. 2007).

symptoms, as well as a bottom bunk permit.  Dkt. No. 90 ¶ 18.  However, on May 15 nonparty Dr. Subbarao Ramineni discontinued Plaintiff's prescription for Neurontin because Plaintiff had "no documentation of neuropathy" and no history of seizures.  Dkt. No. 90 ¶ 20; *see also* Dkt. No. 75-2 at 64.

Plaintiff's first medical encounter with Defendant Dr. Samad was on May 20, 2019.  Dkt. No. 90 ¶ 54.  The medical record from this encounter suggests that Plaintiff requested to be evaluated for Neurontin.  Dkt. No. 75-2 at 64.  The medical record further indicates that Dr. Samad ultimately ordered "no Neurontin."  *Id.*  Dr. Samad did issue Plaintiff a "bottom bunk" pass, and authorized his use of a right lower leg brace.  *Id.*  Dr. Samad also discontinued Plaintiff's prescription for Meloxicam due to its side effects, and alternatively prescribed Motrin.  Dkt. No. 90 ¶ 56; *see also* Dkt. No. 75-2 at 64.  The parties dispute whether Motrin provided relief for Plaintiff's complaints of pain.  Dkt. No. 90 ¶ 57.  The parties also dispute whether Dr. Samad explained to Plaintiff that Neurontin was not an appropriate medication for him, because "Dr. Samad was not clear on whether Plaintiff had a medical diagnosis of Neuropathy," as opposed to "generalized complaints of pain from an injury and surgery from 2006."  *Id.* at ¶ 65.  Dr. Samad offered Plaintiff Elavil for his neuropathic pain, which Plaintiff refused.  *Id.* at ¶ 59, *see also* Dkt. No. 75-2 at 64.  According to Plaintiff, he did not want to take Elavil because it is a psychotropic medication.  Dkt. No. 90 ¶ 59.  Ultimately, the parties dispute whether Dr. Samad refused to prescribe Plaintiff Neurontin on May 20 based on his independent medical judgment that Neurontin was not an appropriate treatment for Plaintiff, or because Dr. Samad "could not prescribe the medication" pursuant to the MWAP Policy in effect at the time.  *Id.* at ¶¶ 65-68, 76.

Dr. Samad saw Plaintiff again on May 28, 2019, to discuss his neuropathy.  Dkt. No. 90 ¶ 72.  Dr. Samad informed Plaintiff that he would not prescribe Neurontin, and Plaintiff asked for

Naproxen as an alternative to Ibuprofen. *Id.* at ¶ 73. Dr. Samad approved the change and prescribed Naproxen. *Id.* at ¶ 74. According to Plaintiff, Dr. Samad stated "we don't give opiods." *Id.* at ¶¶ 76-77.

Plaintiff's third and final medical encounter with Dr. Samad was on June 11, 2019. Dkt. No. 90 ¶ 80. Plaintiff wanted to discuss his medical condition with Dr. Samad "again," and claimed that Dr. Samad "did not review his entire medical record." *Id.* at ¶ 81. Dr. Samad discussed – to some disputed extent - Plaintiff's medication with him and offered him alternative medications for his "purported" neuropathy, including Elavil and Cymbalta, which Plaintiff refused. *Id.* at ¶¶ 81-84. Plaintiff continued to request Neurontin, and complained of difficulty ambulating. *Id.* at ¶¶85, 89. According to Defendant, Plaintiff has been observed ambulating distances without issue with the use of his leg brace, and Dr. Samad was concerned that Plaintiff's focus on Neurontin constituted concerning drug seeking behavior. *Id.* at ¶¶ 90-93. Plaintiff disputes the abuse liability of Neurontin, or that it formed a basis for Dr. Samad's individual assessment of whether Plaintiff should be prescribed Neurontin, and maintains that he continued to request Neurontin because it was an effective alternative. *Id.* at ¶¶ 90-95.

On May 19, 2020, approximately one year after Plaintiff's last medical encounter with Dr. Samad, Plaintiff was transferred out of Mohawk Correctional Facility. Dkt. No. 90 ¶ 135. His transfer was subject to the "Corrections Law § 73 Residential Treatment Outcount Program." *Id.* at ¶ 136. Pursuant to this program, Plaintiff was released from confinement in a DOCCS facility to a residential treatment facility. *Id.* at ¶¶ 137-39. As of the date of Plaintiff's transfer, he no longer received medical care from Mohawk Correctional Facility. *Id.* at ¶ 140. Plaintiff was released to parole on August 17, 2020. *Id.* at ¶ 259.

## III.    STANDARD OF REVIEW

Under Rule 56(a), summary judgment may be granted only if all the submissions taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. A fact is "material" if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *see also Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*). The movant may meet this burden by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322; *see also Selevan v. N.Y. Thruway Auth.*, 711 F.3d 253, 256 (2d Cir. 2013) (explaining that summary judgment is appropriate where the nonmoving party fails to "'come forth with evidence sufficient to permit a reasonable juror to return a verdict in his or her favor on' an essential element of a claim" (quoting *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 509 (2d Cir. 2010))).

If the moving party meets this burden, the nonmoving party must "set out specific facts showing a genuine issue for trial." *Anderson*, 477 U.S. at 248, 250; *see also Celotex*, 477 U.S. at 323–24; *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). "When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003). Still, the nonmoving

party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and cannot rely on "mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986) (quoting *Quarles v. Gen. Motors Corp.*, 758 F.2d 839, 840 (2d Cir. 1985)).  Furthermore, "[m]ere conclusory allegations or denials . . . cannot by themselves create a genuine issue of material fact where none would otherwise exist." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (quoting *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995)).

## IV.    DISCUSSION

Defendant argues, among other things, that Plaintiff's claim is time-barred and must therefore be dismissed.  Dkt. No.  74-2 at 9-15.  Plaintiff argues that he is entitled to equitable tolling pursuant to *Gonzalez v. Hasty,* 651 F.3d 318 (2d Cir. 2011), which held that prisoners' federal claims are tolled while they exhaust their administrative remedies as mandated by the Prisoner Litigation Reform Act (PLRA).  Dkt. No. 91 at 37-39.  In reply, Defendant argues that (1) Plaintiff commenced this action three years after he was released from prison, thus the exhaustion requirement under the PLRA did not apply to Plaintiff, and (2) even if Plaintiff were afforded the benefit of a partial toll, the statute of limitations still expired before Plaintiff commenced this action by the filing of a complaint.  Dkt. No. 95 at 5-7.

"Equitable tolling is an extraordinary measure that applies only when plaintiff is prevented from filing despite exercising that level of diligence which could reasonably be expected in the circumstances." *Veltri v. Bldg. Serv. 32B–J Pension Fund*, 393 F.3d 318, 322 (2d Cir. 2004). In *Gonzalez v. Hasty*, the Second Circuit adopted the rule that "equitable tolling is applicable to the time period during which a prisoner-plaintiff is exhausting his administrative remedies pursuant to the PLRA."  651 F.3d 318, 323 (2d Cir. 2011). In joining the Ninth, Fifth, Seventh, and Sixth

Circuits in this decision, the Court agreed that "[t]he 'catch-22' . . . is self-evident: the prisoner who files suit . . . prior to exhausting administrative remedies risks dismissal based upon § 1997e; whereas the prisoner who waits to exhaust his administrative remedies risks dismissal based upon untimeliness." *Id.* (quoting *Johnson v. Rivera*, 272 F.3d 519, 522 (7th Cir. 2001)). The Court also shared the concern that "any other interpretation of the PLRA could 'permit [prison officials] to exploit the exhaustion requirement through indefinite delay in responding to grievances.'" *Id.* (quoting *Lewis v. Washington*, 300 F.3d 829, 833 (7th Cir. 2002)). Nevertheless, "[t]he statute of limitations . . . is only tolled during the period when a prisoner is 'actively exhausting' his administrative remedies." *Melendez v. Greiner*, 477 F. App'x 801, 803 (2d Cir. 2012) (quoting Gonzalez, 651 F.3d at 322 n.2). The statute of limitations is therefore not tolled between the time that the cause of action accrues and the time that plaintiff begins the administrative exhaustion process. *Gonzalez,* 651 F.3d at 324.

Here, the facts relevant to a determination of whether equitable tolling renders Plaintiff's claim timely are largely undisputed. The parties agree that Plaintiff's claim accrued on May 16, 2019, and that Plaintiff's June 5, 2019 grievance commenced the tolling period pursuant to *Gonzalez*. It is further undisputed that Plaintiff was released to parole on August 17, 2020, prior to receiving a final decision from CORC on his grievance. Dkt. No. 90 ¶ 259. The parties only dispute the applicable end-date for Plaintiff's exhaustion-based tolling, which in this case is the determinative factor in deciding the timeliness of Plaintiff's claim. According to Plaintiff, the equitable tolling provision "applies even when a prisoner is subsequently released from custody before fully exhausting his remedies." Dkt. No. 91 at 38-39. Thus, argues Plaintiff, he is entitled to equitable tolling from June 5, 2019 until September 10, 2020, the date CORC scheduled his grievance for a determination. This would result in the statute of limitations expiring on August

8

21, 2023, four days after this action was commenced. Alternatively, Defendant argues that Plaintiff was not entitled to tolling once he was paroled out of DOCCS custody, because he was no longer "actively exhausting" his administrative remedies and no longer subject to the filing limitations of the PLRA. Dkt. No. 95 at 6. This would result in a partial tolling period, with the statute of limitations expiring on July 28, 2023, twenty days before Plaintiff filed this action.

In support of Plaintiff's argument that he is entitled to the benefit of equitable tolling for the period of time after his release from custody, Plaintiff cites to one report-recommendation from this district. Dkt. No. 91 at 38-39 (citing *Mobley v. Crane*, No. 21-cv-0299 (BKS/ATB), 2021 U.S. LEXIS 212656, at *8 (N.D.N.Y. Nov. 3, 2021)). However, the *Mobley* report-recommendation addressed whether a former-inmate plaintiff was entitled to equitable tolling to the extent he did or did not file a grievance when he was still in DOCCS custody. *Id. Mobley* has no bearing on the central issue here - whether a Plaintiff may benefit from the continued tolling of a statute of limitations upon his release from custody because his administrative remedies were not yet fully exhausted.

The overwhelming authority suggests that Plaintiff may not take advantage of the equitable tolling doctrine in this manner. As a general matter, equitable tolling applies "only in rare and exceptional circumstances, where . . . extraordinary circumstances prevented a party from timely performing a required act, and . . . the party acted with reasonable diligence throughout the period he [sought] to toll." *Walker v. Jastremski*, 430 F.3d 560, 564 (2d Cir. 2005) (internal quotation marks and citation omitted). "Generally, a litigant seeking equitable tolling bears the burden of establishing two elements: (1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way." *Smalls v. Collins*, 10 F.4th 117, 145 (2d Cir. 2021) (citation omitted). "The law prohibits a judge from exercising her discretion where these two

9

elements are missing[,]" however "[i]f they are found to be present . . . then a judge brings discretionary considerations to bear in deciding whether to permit equitable tolling." *Doe v. United States*, 76 F.4th 64, 71 (2d Cir. 2023). The *Gonzalez* Court explicitly recognized these elements in applying the equitable tolling doctrine to prisoners pursing mandatory administrative remedies, who could not otherwise file suit while subject to the restrictions of the PLRA.

Here, Plaintiff cannot establish that either of the requisite elements for the application of equitable tolling existed once he was released to parole. The relevant provision of the PLRA states that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted. 42 U.S.C. § 1997e(a). The PLRA further defines the term "prisoner" as "any person incarcerated or detained in any facility who is accused of, convicted of, sentenced for, or adjudicated delinquent for, violations of criminal law or the terms and conditions of parole, probation, pretrial release, or diversionary program." *Id.* § 1997e(h). As the Second Circuit has endorsed, the PLRA's definition of "prisoner" does not include individuals released to parole. *See DeBoe v. Du Bois*, 503 F. App'x 85, 88 (2d Cir. 2012) (citing *LaFontant v. INS*, 135 F.3d 158, 165 (D.C.Cir. 1998) ("Although LaFontant was a 'prisoner' for purposes of the PLRA when he served time for past convictions, he ceased being a 'prisoner' at the time he was released on parole.")). Because Plaintiff was not a "prisoner" for purposes of the PLRA once he was released to parole, he was not subject to its restrictions and furthermore could not have taken advantage of the PLRA administrative exhaustion scheme upon release. Thus, Plaintiff cannot meaningfully establish that he was "actively pursuing" his administrative remedies upon release, or that the PLRA prevented him from commencing this action.

Consistent with this analysis, courts have declined to recognize the PLRA as a basis to toll the statute of limitations after an inmate-plaintiff's transfer and/or release from custody. *See Jones v. City of New York,* 571 F. Supp. 3d 118, 129 (S.D.N.Y. 2021) (declining to extend equitable tolling after Plaintiff's transfer from city to state custody, reasoning that "Jones could not possibly be entitled to tolling" because after the transfer "nothing prevented [him] from filing suit"); *Hardy v. Wohlfert*, No. 1:10-cv-1087, 2011 WL 3813250, at *1 (W.D. Mich. Aug. 29, 2011) ("However, because Plaintiff filed his lawsuit after he was released from prison, the exhaustion requirements of the Prison Litigation Reform Act do not apply . . . . because the exhaustion requirements do not apply, Plaintiff cannot rely on those requirements to toll the statute of limitation.") (internal citations omitted); *Huddleston v. Tasky*, No. 3:23-cv-1222, 2025 WL 2687004, at *3 (S.D. Ill. Sept. 19, 2025) ("While tolling undoubtedly applies to the period of time that Plaintiff was attempting to exhaust his administrative remedies, the fatal flaw to Plaintiff's argument is that the requirement for him to exhaust his administrative remedies was not present once he was released . . . . Therefore, any exhaustion-based tolling would have ended when he was released on June 22, 2020.") (internal citations omitted); *Balderas v. Hale*, No. 20-cv-516, 2021 WL 961712, at *2 (S.D. Ill. Mar. 15, 2021) ("[O]nce Plaintiff was moved from the St. Clair County Jail in August 2017, he clearly was not going to receive any further action in response to any grievances he may have filed and, as such, the two-year statute of limitations period began to run.").

For all of these reasons, the Court concludes that Plaintiff is not entitled to tolling beyond the date of his release to parole. Plaintiff's statute of limitations, even if partially tolled for the period of time after he filed a grievance and remained in DOCCS custody, expired at the latest on July 28, 2023. Thus, Plaintiff's claims were not timely filed by way of his August 17, 2023 Complaint, and dismissal is warranted on this basis.

11

## V.   CONCLUSION

For these reasons, it is

**ORDERED** that Defendant's motion for summary judgment is **GRANTED,** and Plaintiff's Second Amended Complaint is **DISMISSED with prejudice** as time-barred, and it further

**ORDERED** that the Clerk of the Court enter judgment accordingly and close this file.

 **IT IS SO ORDERED.**

Dated: August 5, 2026

Elizabeth C. Coombe
U.S. District Judge